12104

THOMAS v. MacNEILL

(135 S. E., 643)

1. GUARDIAN AND WARD—PETITION BY HUSBAND OF DECEASED WARD AGAINST GUARDIAN FOR ACCOUNTING HELD BARRED BY LACHES AND STALE DEMAND.—Petition by husband of deceased ward for accounting by guardian five years after ward's death, who had reached her majority some fifteen years previously without having made demand, *held* barred by laches and stale demand.

2. EQUITY—"LACHES" IS UNREASONABLE NEGLECT TO DO WHAT IN LAW SHOULD HAVE BEEN DONE.—"Laches" is neglect for unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done.

3. EQUITY—"STALE DEMAND" IS ONE UNASSERTED FOR A LONG TIME.—"Stale demand" is one that has remained for a long time unasserted.

4. EQUITY—MERE DELAY IN ENFORCING DEMAND WILL NOT BAR RELIEF.—Mere delay in enforcing demand, in absence of bar by statutory limitation or other circumstances tending to render demand inequitable, will not bar relief.

5. EQUITY—LONG LAPSE OF TIME MAY CREATE PRESUMPTION THAT VALID RIGHT NEVER EXISTED OR HAS BEEN SATISFIED OR LOST.—Long lapse of time, when taken with other circumstances, may create presumption that valid right never existed or has been satisfied or lost by abandonment, waiver, acquiescence, or equitable estoppel.

6. GUARDIAN AND WARD—CIRCUMSTANCES, WHEN COMBINED WITH LAPSE OF TIME IN ASKING FOR ACCOUNTING, HELD TO SHOW THAT ANY RIGHT OF ACTION BY WARD AGAINST GUARDIAN HAD BEEN COMPLETELY ABANDONED.—Circumstances that deceased ward, well educated and intelligent, had given mother receipt and discharge in

guardianship matter in consideration of expenses on her education, combined with fact that no demand for accounting was made until five years after her death by her husband, which was some nineteen years after she became of age, *held* to show that, if any right of action remained, it had been completely abandoned.

7. GUARDIAN AND WARD—GUARDIAN SHOULD FOLLOW LAWS IN SETTLING WARD'S ESTATE.—Guardian should adhere strictly to method prescribed by law for settlement of ward's estate.

Before GRIMBALL, Special Judge, Greenville, April, 1925. Affirmed.

Petition for accounting by Charles Randolph Thomas, Jr, as executor of the last will and testament of Clara MacNeill Thomas, against Mary K. MacNeill, as guardian of Clara MacNeill Thomas. Decree affirming an order of the probate Court dismissing the petition, and petitioner appeals.

*Messrs. Martin & Blythe,* for appellant, cite: *Document of a nature to be delivered, but never delivered, not admissible as evidence of admission therein set out:* 22 C. J., 308. *Conditional delivery of an instrument:* 11 S. C. Eq., 286; 13 C. H., 307. *Delivery essential to valid gift:* 4 Rich. Eq., 9; 1 N. & McC., 218; Dudley Eq., 14; 3 A. L. R., 1902. *Settlements between guardian and ward out of Court; burden on guardian to prove fair settlement:* 61 S. C., 506; 89 A. S. R., 303; L. R. A., 1916-E, 865; 9 L. J. Chg., 155; 2 Pom. Eq. Jur., Sec. 961; 26 C. J., 1266; 2 Leigh (Va.), 11; 54 Ala., 510; 155 P., 356; L. R. A., 1916-E, 864 note. *Same; utmost good faith required of guardian:* 89 S. C., 268; 82 S. C., 206; 61 S. C., 506; 8 S. C., 361; 1 S. C., 421; 11 S. C. Eq., 286; 28 C. J., 1266; L. R. A., 1916-E, 866. *Guardian can expend corpus of estate on order of Court only:* 3 Strob. Eq., 31. *Expenditures of corpus of estate by guardian deemed gratuities:* 123 S. E., 764; 73 S. C., 429; 1 S. C., 337. *Answers not responsive to questions may be stricken out on objection:* 40 Cyc., 2444. *Amount of judgment:* 8 S. C., 362.

*Messrs. Haynsworth & Haynsworth,* for respondent, cite:
*Petitioner guilty of laches in asserting claim:* 102 S. C.,
490; 19 S. C., 560; 9 S. C., 86; 8 S. C., 347; 2 Hill Eq.,
228; 11 Rich. Eq., 559; 8 How., 220; 7 Wall, 390; 1 Moore
on Facts, Sec. 550. *Guardian may expend corpus of estate
where necessary without order of Court:* 52 S. C., 109.
*Contract of settlement between guardian and ward after
majority not prima facie void; burden of proof on party
alleging fraud:* 8 S. C., 347; 249 F., 344; 11 L. R. A., 726;
113 C. C. A., 572; 12 Pet., 241. *Evidence introduced with-
out objection cannot be stricken out on motion:* 113 S. C.,
205; 109 S. C., 160; 97 S. C., 148; 67 S. C., 175; 51 S. C.,
281. *Admissibility of self-serving declarations by deceased
when offered by his representatives:* 101 S. C., 238; 85
S. E., 590; 80 S. C., 220; 75 S. C., 342; 55 S. E., 768; 36
S. C., 598; 29 S. C., 332; 12 S. C., 32; 119 S. C., 464;
134 N. E., 754; 205 P., 426; 127 S. E., 337.

November 16, 1926.

The opinion of the Court was delivered by MR. JUSTICE
STABLER.

This proceeding was begun in the probate Court for
Greenville County by the filing of a petition by Charles
Randolph Thomas, Jr., as executor of the last will and testa-
ment of Clara MacNeill Thomas, against Mary K. Mac-
Neill, as guardian of Clara MacNeill Thomas, seeking an
accounting in the said guardianship matter. On January
1, 1925, the Judge of Probate for the said County filed an
order dismissing the petition, from which order appeal was
made to the Court of Common Pleas. Thereafter, the
case was duly heard before his Honor, William H. Grim-
ball, Special Judge, at the regular term of the Court of
Common Pleas for said County, and on April 18, 1925,
he filed a decree affirming the order of the Probate Judge.
Appeal is made, on a number of exceptions, from Judge
Grimball's order to this Court.

The facts are well and correctly stated in Judge Grimball's decree, as follows:

"This case comes before me on exceptions to a decree of the Probate Court of Greenville County.

"The facts are as follows:

"In February, 1898, the defendant, Mary K. MacNeill (a widow), was appointed by the Probate Court for Greenville County, guardian for her daughter, Clara N. MacNeill, and as guardian she received in securities and money some $6,000.

"Clara, who lived with her mother, became a student in the Greenville Woman's College, from which she graduated in course of time. She possessed considerable musical talent, and her mother was desirous of giving her every opportunity to cultivate this talent. They went to New York, where for two years Clara pursued her musical studies. Then they went to Germany, where Clara took lessons under eminent masters for one year. After this they returned to New York and dwelt there for the greater portion of several years. Clara's expenses, as shown by the testimony, were considerably more than the income received from her estate. Mrs. MacNeill testified that she spent all the income from her own estate and encroached upon the principal.

"Clara came of age on October 7, 1905. In 1909, in company with her mother, she went to the office of Jas. H. Price, a member of the Greenville Bar, and stating that her mother had turned over to her and had spent on her education a much greater sum than the property received by her as guardian, she instructed Mr. Price to draw a release acknowledging this fact and discharging Mrs. MacNeill from any further liability. Mr. Price drew the release and it was signed by Clara, who left it with Mr. Price. Clara continued to live with her mother, and some years afterward she married Charles R. Thomas, by whom she had two children. She died in March, 1919, leaving a will

by which she appointed her husband as executor. The returns in the Probate Court show that at the time of her death, she owned in money and securities approximately $12,000.

"In the summer of 1924, this petition was filed to compel Mrs. MacNeill to account for the assets which came into her hands as guardian. This proceeding was started nearly nineteen years after she executed the release to her mother, and more than five years after her death. The execution of the release, the failure of Clara to make any claim during her lifetime against Mrs. MacNeill, and the failure of the executor, for so long a time, to assert such claim, constitute proof of the most convincing character. In addition, there is the testimony of Mrs. MacNeill, brought out on cross-examination, to the effect that the money spent on Clara's education amounted to more than the income from Clara's estate, and that in addition she turned over to Clara assets of greater value than her estate. In corroboration of Mrs. MacNeill's testimony on this point, the records show that at Clara's death she left an estate in money and securities of approximately $12,000.

"I have carefully considered the authorities cited by the attorneys for the executor, but I find in them nothing to alter my conclusion that the decree of the Probate Judge should be affirmed.

"The cases cited by the attorneys for the petitioner are illustrations of the general rule that transactions between guardian and ward, parent and child, and all other persons standing in a fiduciary relation, will be closely scrutinized, and that the Court will not hesitate to grant relief against settlements, induced through fraud, imposition, or concealment. But the very statement of the rule carries the implication that settlements fairly made, involving no element of fraud, imposition, or concealment, will be sustained.

"If we assume, for sake of argument, that the money ex-

pended by Mrs. MacNeill in Clara's education and support was not properly chargeable against Clara's estate, yet if this money was expended in Clara's interest and in accordance with her wishes, the recognition of such expenses as proper charges would be fair and creditable to all concerned. A release prompted by such motive was sustained in the case of *Livingston v. Wells,* 8 S. C., 347.

"In this case, it appears that Mrs. MacNeill not only paid these expenses incurred in Clara's education and support, but that she also turned over to Clara, in money and securities, a sum considerably more than her ward's estate. In my opinion, the execution of the release was fair and equitable and involved no element of fraud, imposition, or concealment. It is true that Mrs. MacNeill kept no books, but, as she testified, she took securities which show for themselves, and with which Clara was thoroughly familiar.

"The release made in 1909, and not questioned until 1924, must stand, and it is so ordered.

"Those exceptions which seek to exclude certain portions of Mrs. MacNeill's testimony must be overruled. This testimony was developed on the cross-examination without any objection beink taken at the time. It was tool ate to question this testimony by the motion to strike, which was subsequently made. If any portion of the testimony was objectionable as not being responsive to the question, or as violative of Section 708 of the Code of Civil Procedure, or for any other reason, there should have been an objection made at the time. In the absence of such objection, the testimony, if relevant, could not be excluded."

After careful examination of all the facts and of the law applicable to this case, we are of opinion that Judge Grimball's conclusion is correct. But we desire to call attention more particularly to certain circumstances which, in our opinion, render it inequitable to grant the relief demanded.

In our view, the petitioner is effectually barred by laches or the staleness of his demand. Strictly speaking, there are some points of distinction between laches and staleness of demand. "Laches" has been defined as "the neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done" (21 C. J., 210); and as "the neglecting or the omitting to do what in law should have been done, and this for an unreasonable and unexplained length of time, and in circumstances which afforded opportunity for diligence" (*Babb v. Sullivan,* 43 S. C., 436; 21 S. E., 277). A "stale demand" has been defined as "one that has for a long time remained unasserted; one that is first asserted after an unexplained delay of such great length as to render it difficult or impossible for the Court to ascertain the truth of the matters in controversy and to do justice between the parties, or as to create a presumption against the existence or validity of the claim, or a presumption that it has been abandoned or satisfied" (21 C. J., 211). Technically, there are some points of distinction between laches and staleness of demand. Staleness of demand implies a greater lapse of time than is necessary to laches. Again, laches generally involves such change in conditions as would render inequitable the enforcement of a claim, while no such change is necessary in order to create staleness of demand. However, they both fall within the same general principles of equity, and the distinctions are of little practical importance (21 C. J., 211). There is no fixed rule as to what constitute laches or staleness of demand. All the circumstances of each case as it arises must be taken into consideration, and each case will be decided upon its own facts; such decision being largely in the discretion of the chancellor.

While lapse of time is an important element, the better view—though there are cases apparently holding the contrary—is that mere delay in enforcing a

demand, in the absence of a bar by statutory limitation or of other circumstances tending to render the demand inequitable, will not bar relief. A long lapse of time, however, especially when taken with other circumstances, may create a presumption that a valid right never existed; or that if it existed it has been satisfied, or lost by abandonment, waiver, acquiescence, or equitable estoppel.

In *Kirksey v. Keith,* 11 Rich. Eq., 33, the Court quotes with approval the following extract from the opinion of Chief Justice Taney in *McKnight v. Taylor,* 1 How., 161; 11 L. Ed., 86:

"It is not merely on the presumption of payment, or in analogy to the statute of limations, that a Court of chancery refuses to lend its aid to stale demands. There must be conscience, good faith, and reasonable diligence, to call into action the powers of the Court. In matters of account, where they are not barred by the act of limitations, Courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost."

In *Cook v. Knight,* 106 S. C., 310; 91 S. E., 312, the Court quotes with approval from *Babb v. Sullivan,* 43 S. C., 436; 21 S. E., 277; as follows:

"We have seen from the very nature of equity jurisdiction and the principles that guide and control its exercise, it is impracticable if not impossible to fix a definite period of time as a bar of limitations to suits in equity; that lapse of time is not the only test of staleness; that it needs to be conjoined with negligence or inattention, and with opportunity for diligence and for acting sooner. For it is of the essence of laches that the party charged with it should have had either actual knowledge or such notice as would have put him on inquiry."

The testimony in the case at bar shows that the ward was a well-educated and highly intelligent woman, having studied in Greenville, in New York, and in Berlin, and that she knew all about the business transactions of her mother as her guardian. With this knowledge, four years after she became of age she went to the office of Mr. James H. Price, a lifelong friend who was attorney for herself and her mother from time to time, and told him that she wanted to give her mother a complete receipt and discharge in the guardianship matter. Mr. Price is a disinterested party, and his clear, unequivocal testimony on this point is of great importance. To quote his exact words:

"Miss Clara seemed to realize that her mother had more than given her more than was coming to her, and without the necessity of having any accounting she wanted to give her mother a complete receipt and discharge, and for that reason we didn't go into a detailed business accounting, but at her instance that (release) was prepared. * * * I don't know how the settlement was made. I knew Miss Clara was of age at that time. I knew she was of age, and she was absolutely satisfied she had everything coming to her, she said, and I didn't go into the details of it."

Mr. Price, thereupon, in accordance with the ward's request, prepared, and the ward signed, a complete release and discharge of her mother in the guardianship matter. Six years passed and the ward married the petitioner (1915) with whom she lived until her death in the year 1919, leaving him and two infant children surviving her. The testimony shows that there was an unusually close relationship between the ward and her mother, the mother even accompanying her when she went to New York and Berlin to study. There is no evidence of any undue influence, fraud, or deception in the signing of the release—in fact, the testimony is quite to the contrary. The fact that the ward lived with her husband, presumably under his influence, for four

years after she had signed the release without seeking an accounting or endeavoring to attack the discharge which she had given her mother, is further evidence that she was entirely satisfied in the matter. Indeed, she herself never attempted to bring any action against her mother, and it was not until five years after her death that this proceeding was begun by her executor.

We do not feel that these circumstances, combined with the great lapse of time, are subject to any interpretation other than that the ward never had any right of action against her mother or that, if she had such right, she had intentionally and consciously and with full knowledge abandoned it. The release which she executed and left with Mr. Price in her mother's presence indicates her full intention to voluntarily put an end to the relationship of guardian and ward existing between her mother and herself, and both parties were justified in relying upon a presumption that such relationship was thereby ended. Such lapse of time, coupled with her admission that she had received more than was due her from her ward estate, the execution of the release, her statements accompanying same, her unusual intelligence, the full disclosure to her by her guardian, and her opportunity for full investigation and action, are not consistent with any other conclusion, and her inaction during fourteen years is unexplainable under any other hypothesis.

Following the general rule, the present case is decided alone upon its own peculiar facts and circumstances.

We desire to state here, however, that this Court does not look with favor upon the practice of settling trust estates out of Court. For the protection of the ward, which is the chief concern of the Courts in such matters, the law prescribes the method for the settlement of such estates, and guardians should adhere strictly to this method.

The judgment of this Court is that the judgment of the circuit Court be affirmed.

MESSRS. JUSTICES WATTS, COTHRAN, and BLEASE and MR. ACTING ASSOCIATE JUSTICE PURDY concur.

MR. CHIEF JUSTICE GARY did not participate.